IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 25, 2010 Session

**KENNETH ALAN STEELE v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 244865     Don W. Poole, Judge**

---

**No. E2009-02376-CCA-R3-PC - Filed March 10, 2011**

---

The Petitioner, Kenneth Alan Steele, filed a petition for a writ of error coram nobis, alleging that because of newly discovered DNA evidence, his convictions should be vacated and/or he should be granted a new trial to present evidence of a third-party perpetrator. On appeal, the Petitioner argues that the trial court erred by dismissing his petition without a hearing and that it applied the wrong standard in making its ruling. We agree that the trial court used the wrong standard; nevertheless, we conclude that the trial court did not err in dismissing the petition. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., joined. JAMES CURWOOD WITT, JR., J., filed a separate concurring opinion.

Benjamin L. McGowan, Chattanooga, Tennessee, for the appellant, Kenneth Alan Steele.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William H. Cox, III, District Attorney General; and Neal Pinkston, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

This court previously noted that the Petitioner "was charged on 21 separate indictments involving eight separate victims and spanning a time period from November 17, 1987 through June 30, 1990." State v. Kenneth Alan Steele, No. 03C01-9207-CR-233, 1993 WL 415836, at *1 (Tenn. Crim. App. at Knoxville, Oct. 13, 1993). Upon motion of the

State, the trial court consolidated the indictments and the case proceeded to trial. Id. At trial, the jury found the Petitioner guilty as charged, and he was convicted of five counts of first degree burglary, three counts of aggravated burglary, three counts of aggravated rape, three counts of armed robbery, one count of aggravated robbery, one count of rape, one count of attempted rape, one count of attempt to commit armed robbery, one count of assault with intent to commit rape, one count of aggravated assault, and one count of theft of property.

This court previously summarized the proof adduced at trial as follows:

> PM testified that on November 17, 1987, she was living with her son in a duplex in the Avondale area of Chattanooga.[1] She had locked the doors and gone to bed when she was awakened by "pats" on her chest. The room was very dark, but she was able to discern a man standing above her. He was holding a knife in his hand and threatened to cut her throat if she did not remain silent. He then ordered her to remove her clothing and proceeded to rape her. PM's assailant then inquired if she had a gun or money. She removed money from her purse and surrendered it to the man. Despite the darkness, PM was able to describe the man as black, with an average build, approximately five feet and ten inches tall, wearing pants, a shirt, and a towel around his head and face. Despite the towel, she was able to see that he had a "close haircut." He also appeared to be left-handed. Finally, she stated that he smelled as if he worked in a gas station. Following the assault, the intruder left the bedroom, indicating that he was "going to take a piss," and would return. PM remained in the bedroom until she was reasonably certain that he had departed her home. [The Petitioner was convicted of the first degree burglary and aggravated rape of PM].
>
> CM testified that on January 3, 1988, she was living with her son in a duplex in Chattanooga. The State's proof revealed that CM's duplex was located in an area in which the police were investigating activities by an unknown individual referred to at that time as the "towel rapist." On the night in question, CM was sleeping with her son when she was awakened by a man placing his hand over her mouth and nose. The man

---

[1] It is the policy of this court to refer to victims of sexual offenses by their initials.

threatened to hurt her son if she did not get up from the bed. Her assailant then forced her down the hallway into the living room, where he raped her. The man was armed with a knife and held the knife to her throat during the assault. Her house was dark, but CM was able to describe her assailant as black, neither fat nor thin, with very little hair or no hair. CM further recalled that, when standing, her head was at the same level as his chest. She testified that she is five feet and one inch tall. She remembered that her assailant was holding the knife in his left hand. Finally, CM stated that the assailant left grease marks with his hands on the wall of her apartment.

Following the rape, CM's assailant threatened to hurt her or her son if she did not remain still. He then left the living room, and CM heard him removing coins from a can she kept in another room. She subsequently discovered that several silver coins and a camera were missing from her home. [The Petitioner was convicted of the first degree burglary, armed robbery, and aggravated rape of CM].

EP testified that on July 26, 1989, she was living with her daughter in a duplex in the Avondale area of Chattanooga. She had gone to bed when she was awakened by a man placing his hand over her mouth. He threatened to hurt her or her child if she screamed. She felt a sharp object against her neck. He told her he was going to "f---" her and then inquired if she had any money. When she told him she did not have money and showed him her empty purse, he began to touch her and remove her clothing. EP informed him that she is disabled and that her legs "were not for doing anything like this." When the man felt her legs, he ceased his assault, apologized, and left. Although the house was very dark, EP was able to testify that the man was approximately five feet and seven or nine inches tall, his body felt heavy on top of hers, and he was wearing "cloth or something" on his head. [The Petitioner was convicted of the first degree burglary, attempt to commit armed robbery, and assault with intent to commit rape of EM].

DM testified that, on July 26, 1989, she was living with her husband and three children in a duplex in the Avondale area

-3-

of Chattanooga. Testimony at trial revealed that her residence was no more than six blocks from EP's home. DM's husband was a truck driver and was away from home for long periods of time. He was away from home on the night in question. DM had gone to sleep when she was awakened by a man standing next to her bed. He immediately "straddled" her on the bed, and she began to struggle. She testified, "I was really fighting and screaming real loud . . . seems like they had something over my face, I can't remember, I don't know. But whoever it was hit me in my eye and then they ran." DM subsequently discovered a butcher knife from her kitchen in her bed. She testified that, when she had gone to sleep that night, the knife had been in her kitchen. DM also discovered that a rifle was missing from her home. At the time of the assault, DM's house was dark, but she was able to describe her assailant as five feet and eight inches tall, with a medium build. According to DM, he "didn't have that much hair." She also recalled that her assailant did not appear to be wearing a shirt. [The Petitioner was convicted of the first degree burglary, armed robbery, and aggravated assault of DM].

ES testified that on October 8, 1989, she was living with her two daughters in a duplex in Chattanooga. The State established that the duplex was located in the same area in which the so called "towel rapist" was operating. ES had gone to bed and was awakened when the door to her bedroom opened. The intruder immediately threatened to kill her if she did not remain silent. He ordered her to remove her clothes and then raped her. During the assault, the assailant held a "box cutter" to her throat. Afterwards, he asked if she had money. When she indicated that she did not, he left the bedroom. He told her that he would kill her if she called the police. Although her house was dark, [ES] was able to testify that her assailant was a black man with an average height and medium build and was wearing a towel on his head. She further testified that the assailant had "average" hair, similar to the petitioner's hair at trial. Following the incident, she discovered that her child's piggy bank, filled with pennies, had been removed from the house and left outside. [The Petitioner was convicted of the first degree burglary, armed robbery, and aggravated rape of ES].

-4-

SB testified that on January 21, 1990, she was living by herself in a duplex in Chattanooga. She had gone to her bedroom and was watching the television. She had locked the door to her bedroom and had placed her telephone in the bed with her. At some point, she heard a noise in the hallway. She immediately called the police. The police arrived in approximately five minutes. At that time, she noticed that a "ceramic dog bank," filled with Canadian money, was missing from her home. SB never saw the intruder. However, she testified that she recognized the petitioner at trial, because he lived in the same neighborhood. [The Petitioner was convicted of the aggravated burglary of SB's residence].

SS testified that on June 24, 1990, she was living with her two daughters in a duplex in the Avondale area of Chattanooga. She had gone to sleep when she was awakened by a man holding his hand over her mouth and pressing a screw driver to her neck. Her assailant told her that he would not harm her if she remained silent. He asked if she had any money. She informed him that she had $75.00 in another room. At that point, he began to fondle her and tried to remove her pants. SS grabbed the screw driver and stabbed him twice close to the collarbone. She did not observe any blood. She stated, "I felt like I hit him enough to, you know, kinda hurt him a little but not too much." SS then began screaming, and her assailant ran out of the bedroom. Although her house was dark, SS was able to describe her assailant as a black man with short hair. He was wearing "some kind of cap on his head." He was taller than she was and had a medium build. He was wearing pants but did not appear to be wearing a shirt. Subsequently, she discovered that the intruder had taken approximately fifteen dollars and some jewelry from her home. [The Petitioner was convicted of the aggravated burglary, aggravated robbery, and attempted rape of SS].

Finally, JP testified that on June 30, 1990, she lived with her daughter in a home in the Avondale area of Chattanooga. She had gone to her bedroom to watch television when she heard a noise. She was leaving her bedroom to investigate when

"this thing came over my head." A man pushed her back into her bedroom and told her that he would "cut" her if she did not remain silent. He asked if she had any money, and she gave him one hundred and fifty dollars. He also retrieved some jewelry from her dresser. The intruder warned JP not to remove the cloth from her head, but she raised the cloth a small amount and was able to see him. She testified that there was enough light to see her assailant. Her assailant, however, was not aware that she could see him and proceeded to rape her. She observed him closely for approximately five minutes. She described her assailant as a black man with a receding hairline. He was wearing a dark blue or black work uniform with a white and red name tag. However, she could not discern the name on the tag. As he was leaving the bedroom, he asked her if she had a gun. When she told him that she did not, he ordered her to remain still and indicated that he was going "to take a pee." The intruder did not return. JP testified that soon after the incident, on the same day, she positively identified the petitioner during a show-up identification procedure at the hospital. She also positively identified the petitioner at trial, and confirmed that the clothing removed from the petitioner following his arrest was the same clothing worn by her assailant. [The Petitioner was convicted of the aggravated burglary, theft of property, and rape of JP].

Harold Jackson, Jr., an officer with the Chattanooga Police Department, testified that he was en route to JP's residence on June 30, 1990, when he observed the petitioner running down the street four or five blocks from JP's home. The police subsequently determined that the petitioner matched JP's description of her assailant, and the police apprehended the petitioner one half of a mile from JP's home. The petitioner was wearing blue work clothes with a name tag trimmed in red. The State's proof revealed that, at the time of his arrest, the petitioner worked at an automobile parts business. The police determined that he both worked and lived in the vicinity of all eight incidents. Moreover, at the time of his arrest, the petitioner had two small scars on his upper torso near the collar bone. Finally, Larry Swafford, an officer with the Chattanooga Police Department, testified that the petitioner is left-handed.

-6-

William Van Atta, a fingerprint specialist with the Federal Bureau of Investigation, testified that latent fingerprints or palm prints were recovered from the scenes of all eight incidents. A total of twenty-six latent fingerprints and four latent palm prints matched those of the petitioner. Agent Van Atta opined that there was no possibility that the fingerprints and palm prints could have been left by someone other than the petitioner.

Pattie Choatie, a serologist with the Tennessee Bureau of Investigation, testified that she was able to analyze semen samples recovered from PM, ES, and JP. She also received a semen sample recovered from CM. However, the sample had not been stored properly and was not amenable to testing. Agent Choatie determined that the assailant in the cases pertaining to PM, ES, and JP, was a "non-secretor." She explained that eighty percent of the population secrete an "antigen" corresponding to their blood type. This antigen is found in bodily fluids, including semen. In contrast, twenty percent of the population do not secrete the antigen. Accordingly, the antigen will not be present in semen from a non-secretor. She confirmed that the petitioner is a non-secretor.

Agent Choatie also testified that, after conducting her tests, she forwarded the semen samples recovered from PM and JP to the Federal Bureau of Investigation for DNA testing. She did not forward the semen sample recovered from CM due to its improper storage. Moreover, Agent Choatie did not forward the semen sample recovered from ES, because she was unable to obtain a liquid blood sample from the victim, which item is essential to DNA testing.

Audrey Lynch, a special agent with the DNA Analysis Unit of the Federal Bureau of Investigation, testified that she had performed a procedure known as Restriction Fragment Length Polymorphism (RFLP) upon semen samples obtained in the cases of PM and JP. Agent Lynch concluded that the DNA of the assailant in both cases "matched" that of the petitioner. She stated that one in one hundred and fifty million people in the black population would produce the same result.

Kenneth Alan Steele v. State, No. 03C01-9701-CR-00012, 1999 WL 512053, at **2-5 (Tenn. Crim. App. at Knoxville, July 21, 1999) (footnotes omitted).

For the foregoing convictions, the Petitioner received a total effective sentence of 165 years in the Tennessee Department of Correction. The Petitioner appealed his convictions and sentences, and this court affirmed his convictions but modified his total effective sentence to 129 years. See Steele, No. 03C01-9207-CR-233, 1993 WL 415836, at *8. Subsequently, the Petitioner pursued two unsuccessful habeas corpus claims and one unsuccessful post-conviction claim. See Steele, No. 03C01-9701-CR-00012, 1999 WL 512053; Kenneth A. Steele v. State, No. 01C01-9708-CC-00105, 1998 WL 120308 (Tenn. Crim. App. at Nashville, Mar. 18, 1998); Kenneth Steele v. State, No. 01C01-9512-CC-00409, 1997 WL 211265 (Tenn. Crim. App. at Nashville, Apr. 30, 1997). Thereafter, the Petitioner filed a petition to reopen his post-conviction petition; however, the trial court determined that the motion should be construed as a petition for a writ of error coram nobis.[2] The Petitioner also filed two amendments to his petition for a writ of error coram nobis.

From various pleadings in the technical record, we discern that in 2003, the Petitioner received reports from the Federal Bureau of Investigation (FBI) indicating that he was excluded as the contributor of DNA collected from two rape victims. The names of the victims were redacted from the report. According to the Petitioner, an FBI agent testified at the Petitioner's trial that testing revealed the Petitioner was the contributor of DNA collected from two rape victims; therefore, the Petitioner believed the report revealed that the State had suppressed contradictory, exculpatory information. However, the Petitioner later learned that the FBI tested DNA samples from four separate rape victims. Two of the samples, which were collected from PM and JP, contained the Petitioner's DNA. However, the other two samples, which were collected from JF and BW, excluded the Petitioner as the contributor. The Petitioner was never charged with crimes relating to JF and BW.

In his amended petitions for a writ of error coram nobis, the Petitioner maintained that prior to trial, defense counsel moved for the disclosure of discovery materials and evidence which were exculpatory under Brady v. Maryland, 373 U.S. 83 (1963). Therefore, the Petitioner asserted he was entitled to relief because the State withheld evidence regarding a possible third-party perpetrator which the Petitioner could have used in his defense. The Petitioner acknowledged that the facts of the case involving BW were so "insufficiently similar" to his case that the State's failure to disclose the crime was not error; however, he

---

[2] Neither the motion to reopen the post-conviction petition or the trial court's initial order construing it as a petition for a writ of error coram nobis are in the record, but we have gleaned their content from subsequent orders filed by the trial court.

contended that the crime involving JF was factually similar to the "towel rapist" offenses for which he was convicted. Specifically, he noted that JF was an African American female living with two young children but no other adults; the perpetrator entered the one-story residence in the early morning through an unlocked window; he was armed with a screwdriver, threatened to harm the children, and demanded cash; and his face was covered with a cloth, possibly a gray shirt. Additionally, he placed a pillowcase over the victim's head; he had a strong body odor and smelled of alcohol; prior to the rape he told the victim "I want you"; and he fled out the back door after the attack. Additionally, the Petitioner maintained that the description JF gave was similar to the ones given by the Petitioner's alleged victims, namely that the perpetrator was a black male, around six feet tall, weighing 165 pounds, and had a medium complexion and "nappy" hair. However, the Petitioner acknowledged certain factual dissimilarities, including greater physical violence in the JF rape; JF endured both vaginal and anal rapes; and the JF crimes occurred near the Alton Park neighborhood, not the Avondale area in which the "towel rapist" incidents predominantly occurred. Nevertheless, the Petitioner argued that the State should have disclosed the crimes relating to JF and the DNA evidence exonerating the Petitioner from those crimes so that he could have argued at trial that a third-party must have committed the similar crimes with which the Petitioner was charged.

In an order, the trial court noted that "[t]he state does not dispute the veracity of the exonerative DNA report or this description of the incident involving [JF] and the Court accepts them as true." Further, because the Petitioner's trial counsel requested Brady material, the court did not "fault the Petitioner for his untimely discovery of the evidence." However, the trial court stated that DNA inculpating the Petitioner was found on two of the eight charged victims, which "evidence was, presumably, no less reliable than the new DNA evidence exculpating him in the ninth incident [involving JF]." Additionally, the court said that the Petitioner's fingerprints or palm prints were found at all eight crime scenes and that the Petitioner bore scars on his "clavicle corresponding to stab wounds inflicted by a victim in one of the six cases in which there was no DNA evidence." Accordingly, the court found that "while 'evidence of *modus operandi*' was the apparent basis for joinder of the charges, there was a sufficient, even strong, independent basis for conviction in each case." Therefore, the court found "that the evidence in issue would not have changed the results of the petitioner's trial."

On appeal, the Petitioner argues that the trial court erred in dismissing the petition without a hearing, maintaining that the trial court applied an incorrect standard in making its ruling. Specifically, the Petitioner contends the trial court erred in finding that the evidence "would not have" changed the result at trial instead of applying the correct standard that the new evidence "might have" changed the result at trial.

## II.  Analysis

Tennessee Code Annotated section 40-26-105(a) and (b) provides:

> There is hereby made available to convicted defendants in criminal cases a proceeding in the nature of a writ of error coram nobis, to be governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except insofar as inconsistent herewith. . . .  Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court.  See State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

We note that the petition for a writ of error coram nobis was filed outside the one-year statute of limitation.  Tenn. Code Ann. § 27-7-103.  However, the State did not raise the untimeliness of the petition as an affirmative defense nor did the trial court deny the petition on this basis. See Harris v. State, 102 S.W.3d 587, 593 (Tenn. 2003) (stating that "the State bears the burden of raising the bar of the statute of limitations as an affirmative defense"). Moreover, the Petitioner's claim would qualify as a "later arising" ground, permitting a petition to be filed outside the statute of limitation.  See Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995) (providing a three-step balancing test to weigh a petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims); Harris v. State, 301 S.W.3d 141, 145 (Tenn. 2010) (endorsing the Sands three-part test).

The writ of error coram nobis is a post-conviction mechanism that has a long history in the common law and the State of Tennessee.  See State v. Vasques, 221 S.W.3d 514, 524-26 (Tenn. 2007).  It is now codified in Tennessee Code Annotated section 40-26-105. The writ "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999).  By its terms, the statute is "confined" to cases in which errors exist outside the record and to matters that were not previously litigated. Tenn. Code Ann. § 40-26-105(b).  Where the case involves a matter that has been previously litigated, the writ will not lie unless the petitioner demonstrates that he

was without fault in failing to present the evidence and that the evidence "may have resulted in a different judgment." Id.

Our supreme court has stated that when examining a petition for a writ of error coram nobis, a trial court is to

> first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

Vasques, 221 S.W.3d at 527. In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceeding might have been different.'" Id. (quoting State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. at Nashville, Oct. 7, 2005)).

As we noted, the Petitioner maintains that the trial court applied an incorrect standard in dismissing his petition. The court found that "there was a sufficient, even strong, independent basis for conviction in each case[, therefore,] the evidence in issue would not have changed the results of the petitioner's trial." The Petitioner contends that the trial court erroneously decided the issue based upon whether the newly discovered evidence "would have" changed the result at trial instead of properly considering whether the new evidence "might have" changed the result at trial. This court has previously stated, "While this appears at first glance to be a matter of mere semantics, the difference in the analysis of the situation under a 'would have' standard is definitively more burdensome for a coram nobis petitioner than would be the case under a 'may have' standard." Margo Freshwater v. State, No. W2006-01758-CCA-OT-CO, 2008 WL 4560242, at *9 (Tenn. Crim. App. at Jackson, Oct. 8, 2008). Therefore, requiring a petitioner to show that the new evidence *would have* resulted in a different verdict is the incorrect standard to use in denying coram nobis relief. See Vasques, 221 S.W.3d at 527-28; Erskine Leroy Johnson v. State, No. W2007-01546-CCA-R3-CO, 2009 WL 3126237, at *8 (Tenn. Crim. App. at Jackson, Sept. 30, 2009). Accordingly, we must conclude that the trial court applied the wrong standard when dismissing the petition.

Nevertheless, we conclude that dismissal of the petition was appropriate. Like the trial court, this court has stated that "even absent the DNA evidence, the State presented overwhelming proof of the petitioner's guilt." Steele, No. 03C01-9701-CR-00012, 1999 WL 512053, at *19. Specifically, we noted that

> [t]he State introduced testimony that fingerprints matching the petitioner's had been recovered from the scenes of all eight incidents underlying the petitioner's indictments, including the incidents relating to PM and JP. Seven victims, including PM and JP, were able to provide descriptions of the assailant. The descriptions were roughly similar to one another and matched the petitioner's appearance. With respect to the incident involving JP, the petitioner was observed immediately following the incident running down the street four blocks away from JP's residence. JP positively identified the petitioner both in a show-up identification procedure immediately following the incident and at trial. Testimony by PM and another victim, CM, suggested that the assailant was left-handed. The petitioner is left-handed. The petitioner had scars in a location where one of the victims had stabbed her assailant with a screw driver. The petitioner lived and worked in close proximity to the locations of all eight incidents. An expert in serology with the Tennessee Bureau of Investigation testified that, with respect to the incidents involving PM, JP, and another victim, ES, she was able to establish that the Petitioner was within the twenty percent of the population who could have committed the crimes. Moreover, . . . all eight incidents possessed similar characteristics strongly suggesting a common perpetrator.

Id. at *14.

The Petitioner argues that if the State had disclosed the evidence regarding JF prior to his trial, he could have pursued a third-party perpetrator defense and could have challenged the accuracy of the fingerprint results. Additionally, the Petitioner maintains that he also could have used the newly discovered evidence to challenge the trial court's decision regarding consolidation. However, this issue was raised on direct appeal, and this court concluded that consolidation was proper. See Steele, No. 03C01-9701-CR-00012, 1999 WL 512053, at *15; Steele, No. 03C01-9207-CR-233, 1993 WL 4158361, at **1-2. Further, we concluded that there was no error regarding the admission of fingerprint evidence at the Petitioner's trial. See Steele, No. 03C01-9701-CR-00012, 1999 WL 512053, at *15.

Accordingly, given the overwhelming evidence against the Petitioner, we conclude that there is no indication that the newly discovered evidence might have changed the verdicts against the Petitioner.

### III.  Conclusion

In sum, although the trial court applied the incorrect standard in dismissing the petition for a writ of error coram nobis, the trial court nevertheless reached the correct result. Therefore, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE